Argued and submitted January 18, affirmed July 10, 1985

# ROBERTI'S HOUSE OF WINES, INC.,
*Appellant,*

*v.*

# SOMERSET WINE COMPANY et al,
*Respondents.*

(A8107-04401; CA A29862)

703 P2d 976

Diane L. Alessi, Portland, argued the cause for appellant. With her on the briefs were Marc D. Blackman, and Ransom, Blackman and Simson, Portland.

Barbee B. Lyon, Portland, argued the cause for respondent. With him on the brief were Tonkon, Torp, Galen, Marmaduke and Booth, Portland.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

## YOUNG, J.

Plaintiff, an Oregon wine wholesaler, brought this action for breach of contract to recover, *inter alia,* damages for lost profits in connection with the alleged wrongful termination of its exclusive distributorship for San Martin Wines.[1] Defendant Somerset Wine Company owns the San Martin Winery. Defendant North Pacific Wine and Spirits, Ltd., is an Oregon broker representing Somerset. The jury, by a special verdict, found that plaintiff was entitled to sixteen months' notice of termination of the distributorship and that defendants failed to give any notice. It awarded plaintiff $22,446.24 in damages for lost profits during the 16-month period.[2] Defendants moved for a judgment notwithstanding the verdict or, alternatively, for a new trial on the ground that the evidence was insufficient to justify the verdict. The trial court granted a new trial on the issue of damages "limited to lost net profits on a monthly basis."

Plaintiff appeals and contends that it was error to grant a new trial, because there was substantial evidence to support the damage award. Defendants assign as errors[3] the failure to grant a judgment n.o.v. or a new trial on the issue of the reasonableness of the notice of termination and the failure to grant a judgment n.o.v. on the issue of damages. The essence of defendants' argument is that the evidence was insufficient to justify the verdict for either the notice of termination or the damages. We agree with the latter argument and therefore affirm the grant of a new trial.

On review, we evaluate the evidence in the light most favorable to plaintiff and accept all conflicts in the evidence as

---

[1] Plaintiff's third amended complaint alleges six claims for relief. At the close of the evidence, the trial court granted plaintiff a directed verdict on three claims and submitted three claims to the jury. The jury found in favor of plaintiff on two of the claims. This appeal concerns plaintiff's first claim for relief.

[2] The jury calculated that plaintiff lost net profits of $1,402.89 per month for sixteen months ($1,402.89 $\times$ 16 = $22,446.24).

[3] Defendants do not cross-appeal. However, ORS 19.130(2) provides:

"Where in the trial court a motion for judgment notwithstanding the verdict and a motion for new trial were made in the alternative, and an appeal is taken from a judgment notwithstanding the verdict or an order granting a new trial, the court to which the appeal is made may consider the correctness of the ruling of the trial court on either or both motions if such ruling is assigned as erroneous in the brief of any party affected by the appeal, without the necessity of a cross-appeal."

having been resolved in its favor. *See Welch v. U.S. Bancorp,* 286 Or 673, 675, 596 P2d 947 (1979). We may affirm the grant of a new trial only if we "can affirmatively say that there was no evidence to support the verdict." Or Const, Art VII (amended), § 3; *Huston v. Trans-Mark Services,* 45 Or App 801, 811, 609 P2d 848, *rev den* 289 Or 587 (1980).

Plaintiff argues that there is substantial evidence to support the jury's verdict that, before the termination of the distributorship, plaintiff's net monthly profit for the sale of San Martin Wine was $1,402.89. Dr. Oh, an economist, testified as an expert witness for plaintiff and calculated the net profit it would have earned had it been allowed to continue as a distributor. Oh prepared and explained the following chart to the jury:

| | |
|---|---:|
| Annualized Sales ('81) | $106,822 |
| Gross Profit Margin ('80-'81) | 27.34% |
| Marginal Variable Expense as % of Wine Sales ('79-'80) | 11.58% |
| Net Margin Before Tax | 15.76% |
| Net Marginal Earnings Before Tax | $ 16,835 |

Oh explained that the last figure on the chart represents annual net profit. That figure, when divided by twelve, results in a net of $1,409.91 per month. The parties agree that that is how the jury arrived at a monthly net profit of $1,409.89. The net profit calculation is dependant upon the correctness of the gross profit margin.[4] Oh testified that he received the gross profit margin percentage from Mr. Roberti, plaintiff's vice president. Roberti testified that he calculated gross profit by subtracting the cost of the wine purchased during the relevant time from the sales receipts during the same period. The difference was then divided by the total sales to arrive at the gross profit margin.[5]

Defendants argue that the figure of $162,790, representing the cost of the wine sold, *supra* n 5, is meaningless,

---

[4] Oh explained how to calculate the gross profit margin:

"Now gross profit * * * is total sales minus costs of goods sold. Now, that could give us a gross profit. We divide * * * the gross profit by gross sales. We then arrive at gross profit margin."

[5] Roberti testified that total wine sales were $222,099 and the cost of the wine sold was $162,790. The difference, $60,712, is gross profit. Dividing gross profit by gross sales results in a gross profit margin of 27.34%.

because Roberti did not consider the inventory on hand at the beginning of the accounting period. Roberti testified that it was not necessary to consider beginning inventory, because the distributorship was on a cash basis, purchases from defendants were on 60- to 90-day credit terms and the inventory turned within 60 days.[6]

Defendants argue that Roberti's explanation for the exclusion of the beginning inventory is faulty because, according to plaintiff's evidence, it sold more wine during the period than it paid for; the proposition is that the difference between the quantity sold and the quantity purchased represents the beginning inventory. Defendants argue that the failure to account for the beginning inventory distorts the gross profit margin and that, therefore, the damage award is not supported by the evidence.

Roberti testified only about the dollar value of sales and purchases. However, the exhibits which he relied on do, to some extent, indicate the quantities of wine purchased and sold. Plaintiff's theory can be tested by comparing the quantities purchased and sold during the relevant period.

To calculate the cost of wine sold, Roberti tallied the invoices, added freight and taxes and subtracted allowances and a payment made by Somerset for the ending inventory.

---

[6] Defendants called the only accountant to testify, and he explained how to calculate cost of goods sold:

"Q. How do you calculate costs of goods sold?

"A. Cost of goods sold * * * is represented by the inventory that you had on hand at the beginning of the period, that is, all of the goods that you had available to sell at that point in time plus any purchases that you made during the period. * * * From that you have to deduct the amount of inventory that you have got at the end of the period * * *. The net of those figures is cost of goods sold for that period.

"Q. In determining a company's gross profit if you don't take into account the beginning inventory or ending inventory, are you likely to distort the gross profit during that, that period?

"A. Yes.

"Q. In fact it wouldn't be a valid figure; would it?

"A. No."

The accountant explained that it made no difference whether the business is on a cash or accrual basis. Either method requires the inclusion of beginning inventory to calculate correctly the cost of goods sold.

| | |
|---|---:|
| Invoices Paid | $162,790.90 |
| Freight and Taxes | 28,428.00 |
| Allowances | (6,930.34) |
| Ending Inventory | (22,901.83) |
| Cost of Wine | $161.386.73 |

The evidence is that the total of the paid invoices for the relevant period, $162,790.90, represents payment to Somerset for 11,321 cases of wine.[7] The $22,901.83 paid by Somerset to plaintiff for inventory on hand after its distributorship was terminated represents 975 cases of wine.[8]

■     Roberti testified that his figure for the dollar amount of wine sold was based on a computer report of sales. He summarized the computer records, and that summary was introduced into evidence. The summary lists the dollar amount sold and the quantity sold during the relevant period.[9] According to the computer summary, plaintiff sold 10,554 cases and 6,919 bottles of wine. In construing the evidence in the light most favorable to plaintiff, it appears that most of the individual bottles sold were 750 milliliters, which come in cases of 12, for a grand total of 11,130 cases. According to plaintiff's evidence, plaintiff paid Somerset for 11,321 cases, sold to its customers 11,130 cases and sold back to Somerset 975 cases. The evidence most favorable to plaintiff establishes that it sold at least 784 cases more than it bought.

---

[7] Attached to each of the paid invoices for wine (included in plaintiff's Exhibits 35, 36 and 37) is an OLCC report which states the number of cases in each shipment.

[8] Plaintiff's Exhibit 53 is the invoice covering the sale of the ending inventory to Somerset. The sale included 963 cases of wine and 136 individual bottles. All but three of the individual bottles were 750 ml, which come in cases of 12; these bottles, when added to the full cases, give an approximate total of 975 cases.

[9] The summary showed:

| | |
|---|---|
| 1/1-6/31/80 | $99,477.87 |
| | 4,951cs/3,790btls |
| 7/1-12/31/80 | $75,330.77 |
| | 3,735cs/2,240btls |
| 1/1-5/15/81 | $40,058.12 |
| | 1,868cs/889btls |

Roberti testified that, in the period covered by the summary, plaintiff sold $222,099 worth of wine. The summary shows total sales of $214,866. We have been unable to find in the record an explanation for this discrepancy. Again giving plaintiff every benefit of the evidence, we will use the greater dollar figure for sale but use the summary figures for the quantities sold. According to the summary, the number of cases sold is 10,554. The number of bottles sold is 6,919, which at 12 bottles a case equals 576 cases for a total of 11,130 cases.

The evidence is that the average cost of a case of wine was $16.27. The 784 cases would have cost $12,755.68. Treating that cost as beginning inventory and purchases made during the accounting period as part of the cost of goods sold, as the accountant explained, *supra* n 6, the cost of the wine sold as testified to by Roberti increased to $174,142; the critical gross profit margin percentage decreased to considerably less than the gross profit margin of 27.34% used by Dr. Oh and accepted by the jury.

Using plaintiff's theory, as we have analyzed it, and viewing the evidence most favorably to plaintiff, the jury's damage award substantially exceeded the actual damages. The trial court did not err when it ruled that the evidence was insufficient to justify the damage verdict and granted a new trial. ORCP 64B(5).

■ ■ We turn to defendants' assignment of error, which raises two separate points. They first argue that it was error to deny their motion for judgment n.o.v. or a new trial on the issue of whether 16 months' prior notice of termination was reasonable. We agree with the trial court that the evidence presented a jury question. Defendants also argue that it was error to deny judgment n.o.v. on the issue of damages. There is evidence in the record which would justify a damage verdict, albeit in a lesser amount than that awarded by the jury. The trial court did not err in denying a judgment n.o.v. *See Jacobs v. Tidewater Barge Lines, Inc.,* 277 Or 809, 562 P2d 545 (1977).

Affirmed.